**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


STEPHEN P. MILES,              )
                                     )
               Plaintiff,       )          Civil Action No. 12-316
                                     )
                 v.          )         Judge Donetta W. Ambrose
                                     )         Magistrate Judge Susan Baxter
CAROLYN W. COLVIN,[1]         )
Acting Commissioner of Social Security,   )
                                     )
               Defendant.     )


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION


## I. RECOMMENDATION

It is respectfully recommended that the Court deny Plaintiff's Motion for Summary Judgment (ECF No. 7),[2] grant Defendant's Motion for Summary Judgment (ECF No. 9), and affirm the decision of the administrative law judge ("ALJ").

## II. REPORT

**A. BACKGROUND**

   1. Procedural History

Stephen P. Miles ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or

---

[1] Ms. Colvin became the Acting Commissioner of Social Security on February 14, 2013. She is automatically substituted as the named defendant in this suit in place of Michael J. Astrue, who previously served as Commissioner. *See* Fed.R.Civ.P. 25(d).

[2] This Court's Order dated March 4, 2013 ordered the parties to file a motion for summary judgment. (ECF No. 6). Plaintiff did not file a motion for summary judgment; rather, he filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 7). In this particular type of proceeding it makes no procedural or substantive difference, since our review is limited to determining whether the ALJ's decision was supported by substantial evidence. Accordingly, we have treated Plaintiff's motion as one for summary judgment and will refer to it as such.

"Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401- 434 ("Act"). Plaintiff filed for benefits, claiming a complete inability to work as of May 1, 2010, due to coronary artery disease, coronary atherosclerosis, claudication, and angina (R. at 124-130, 147).[3] His application was denied (R. at 77-81), and having exhausted all administrative remedies, this matter now comes before the Court on cross motions for summary judgment. (ECF Nos. 7, 9).

2. General Background

Plaintiff was fifty four years old on the date of the ALJ's decision and has a ninth grade education. (R. at 23, 148). Plaintiff's job history included employment as a furnace operator and laborer (R. at 148). Plaintiff reported that he reduced his work load from 40 hours per week to less than 20 hours per week beginning in May 2010. (R. at 143). He further reported earning $600.00 per month working three hours a day six days a week. (R. at 148, 162).

3. Treatment History

a. Medical evidence submitted to the ALJ

Prior to Plaintiff's alleged disability onset date (May 1, 2010), the medical evidence reveals that he had a history of multiple small vessel coronary artery disease and underwent a cardiac catheterization in 2004. (R. at 242).

On January 15, 2010, Plaintiff was seen by Bradley Giannotti, M.D. for complaints of bilateral shoulder pain. (R. at 266). He also complained of left elbow pain and right wrist pain. (R. at 266). On physical examination, Dr. Gianotti found Plaintiff had a limited range of motion in both shoulders with significant Neer and Hawkins sign. (R. at 266). He exhibited a full range of motion in his left elbow and right wrist, although some mild crepitation was noted in his wrist. (R. at 266). He was diagnosed with right wrist degenerative joint disease, early degenerative

---

[3] Citations to the administrative record (ECF No. 5), will be designated by the citation "(R. at __.)"

joint disease of the left elbow, and bilateral rotator cuff impingement with possible tears. (R. at 266). When seen on February 23, 2010, for his upcoming right shoulder surgery, Dr. Giannotti noted that he was "unable to see a discreet (sic) tear" on the Plaintiff's MRI, but noted interstitial damage. (R. 265). Dr. Giannotti indicated that it was his intent to perform at least a subacromial decompression. (R. at 265).

On March 5, 2010, Plaintiff was seen by James Barke, M.D., for clearance for right shoulder surgery. (R. at 230). Plaintiff complained of shortness of breath with exertion, chest tightness, and calf pain with ambulation relieved by rest. (R. at 230). He had a decreased range of motion with pain in his right shoulder. (R. at 230). Dr. Barke did not clear Plaintiff for surgery but ordered an arterial ultrasound. (R. at 230).

The medical evidence following Plaintiff's alleged disability onset date revealed that on May 27, 2010, Plaintiff reported suffering from fatigue after starting cardiac medication. (R. at 229). When seen by Dr. Barke on June 25, 2010 for follow up of a possible thyroid condition, Plaintiff reported that he noticed increased difficulty performing his work. (R. at 228). He complained of increased fatigue and occasional chest pains, but denied any shortness of breath, weakness or numbness. (R. at 228). He reported that he took nitroglycerin on an as needed basis. (R. at 228). His physical examination was unremarkable. (R. at 228).

On July 6, 2010, Plaintiff was seen by Jerome Granato, M.D., a cardiologist, and complained of multiple episodes of chest discomfort over the past three weeks. (R. at 238). He indicated that his discomfort occurred with minimal activity and lasted progressively longer. (R. at 238). Plaintiff reported that his symptoms were relieved with nitroglycerin. (R. at 238). He was admitted to Allegheny General Hospital for further evaluation. (R. at 238). While at the hospital, Plaintiff was seen by Frank Tilli, M.D. and underwent a cardiac catheterization. (R. at

218).  The left main findings revealed no obstructive disease.  (R. at 232).  The left anterior descending revealed 55% diffuse stenosis present in the mid segment.  (R. at 232).  A 30% discrete stenosis was present in the distal segment followed by a 20% diffuse stenosis.  (R. at 232).  A 60% diffuse stenosis was present in the first diagonal followed by an 80% diffuse stenosis.  (R. at 232).  The third diagonal was of small size.  (R. at 232).  The ramus was of large size, and a 70% diffuse stenosis was present followed by an 80% diffuse stenosis.  (R. at 232).  The left circumflex was dominant with 60% tubular stenosis present in the proximal segment.  (R. at 232).  A 90% diffuse stenosis was present in the mid segment.  (R. at 232).  An 80% diffuse stenosis was present in the distal segment, followed by 95% diffuse stenosis, followed by a 100% diffuse stenosis, followed by a 90% diffuse stenosis.  (R. at 232-233).  Plaintiff's right coronary artery was small and nondominent with 80% diffuse stenosis present in the proximal segment, and a 100% discrete stenosis was present in the distal segment.  (R. at 233).  His left ventriculogram revealed normal wall motion with an ejection fraction of 65%.  (R. at 218).  Dr. Tilli recommended increased medication management, and Plaintiff was discharged the next day in stable condition.  (R. at 233).

On November 22, 2010, Plaintiff was seen by Dr. Barke and reported a sudden onset of back pain radiating into both his legs.  (R. at 343).  Plaintiff indicated that he had symptoms in the past that improved with conservative management.  (R. at 343).  Plaintiff stated that he was unable to function at his job because it required some physical exertion.  (R. at 343).  Dr. Barke found marked limitation on forward flexion and lateral bending, and Plaintiff's straight leg raising test was positive on the left.  (R. at 343).  Dr. Barke assessed him with degenerative disc disease with left sided radiculopathy, administered a steroid injection, prescribed a Prednisone taper, and ordered diagnostic studies.  (R. at 343).

An MRI of the Plaintiff's lumbar spine dated November 26, 2010 revealed a large left L3-4 paracentral disk protrusion with superior migration, causing moderate lateral recess narrowing and impingement of the descending left-sided nerve roots. (R. at 318).

When seen by Dr. Barke for follow up of his back pain on December 6, 2010, Plaintiff reported that his pain had completely resolved with steroid therapy. (R. at 342). He reported a "little" numbness down the anterior portion of his leg. (R. at 342). Dr. Barke reported that Plaintiff wanted to resume physical activity since he was "pain free." (R. at 342).

Plaintiff was examined by Dilbagh Singh, M.D., a consulting examiner, on December 13, 2010. (R. at 309-312). Plaintiff relayed a history of a "bad heart" beginning in 2004. (R. at 309). He stated that at that time, he had some chest pain and shortness of breath. (R. at 309). Plaintiff denied any cardiovascular problems, chest pain, shortness of breath, musculoskeletal problems or any neurological symptoms. (R. at 309). Dr. Singh noted a past medical history for coronary artery disease, some leg claudication with pain, MI, and history of a heart catheterization in July 2010. (R. at 310). Plaintiff reported that he had performed factory work for 25 years and at the time of the examination was self-employed in the recycling business. (R. at 310).

On physical examination, Dr. Singh reported that Plaintiff was in no acute distress, and both heart sounds were audible, with no gallop, rub, or murmur of any significance. (R. at 311). His extremity examination revealed that his femorals were palpable bilaterally, and his peripheral pulses were equal on both sides. (R. at 311). Dr. Singh reported that Plaintiff's musculoskeletal and neurological examinations were normal. (R. at 311). His motor power was 5/5 in the upper and lower extremities, his sensory was 5/5 in the upper and lower extremities, his gait was steady, he had no balance problems, and no neurological deficits were noted. (R. at

311).  Dr. Singh diagnosed Plaintiff with, *inter alia*, coronary artery disease, a lipid disorder, high blood pressure/hypertension, and a backache, with a history of some disc disorder off and on.  (R. at 311)  Dr. Singh indicated that Plaintiff was physically stable and was medically managed.  (R. at 312)  Dr. Singh imposed no work related restrictions.

On February 23, 2011, Plaintiff was seen by George Magovern, Jr., M.D., a cardiologist, for a second opinion regarding his coronary artery disease.  (R. at 323)  Dr. Magovern reviewed the cardiac catheterization performed in July 2010, and considered that the LAD lesion may have accelerated in stenosis which would account for the Plaintiff's pain.  (R. at 323)  He recommended a repeat catheterization to determine if the anterior descending or circumflex system could be stented.  (R. at 323)  Dr. Magovern was of the view that Plaintiff's anterior descending was bypassable, but his remaining vessels were not.  (R. at 323)

On March 3, 2011, Plaintiff underwent a cardiac catheterization with stent implantation of the left anterior descending, and selective coronary angiography performed by Dr. Tilli.  (R. at 340-341)  Treatment note entries state that Plaintiff's coronary artery disease had been stable with medical therapy, but that he "recently began to have chest discomfort again."  (R. at 350)  Plaintiff had a successful drug eluting stent of the 70% mid left anterior descending to a 0% residual.  (R. at 341)  The coronary angiography left main findings revealed no obstructive disease.  (R. at 340)  A 45% tubular stenosis was present in the mid segment of the left anterior descending, followed by a 70% diffuse stenosis.  (R. at 340)  A 30% discrete stenosis was present in the distal segment.  (R. at 340)  The first diagonal was of large size, and a 55% diffuse stenosis was present followed by an 80% discrete stenosis.  (R. at 340)  The third diagonal was of small size.  (R. at 340)  The left circumflex was dominant with 60% tubular stenosis present in the mid segment.  (R. at 340)  A 95% diffuse stenosis was present in the distal segment.  (R.

at 340). Plaintiff's right coronary artery was small and nondominent with an 80% diffuse

stenosis present in the mid segment, followed by a 60% diffuse stenosis, and a 95% discrete

stenosis was present in the distal segment. (R. at 340). Plaintiff was discharged in stable

condition. (R. at 350).

On March 10, 2011, Plaintiff was seen by Dr. Barke and reported "significant

improvement of his chest symptoms" after his cardiac catheterization. (R. at 362). Dr. Barke

noted that Plaintiff's cardiac surgeon felt he was not a surgical candidate and encouraged

aggressive medication management. (R. at 362). Plaintiff reported that he felt he could no

longer work. (R. at 362). He stated that he had increased difficulty with back pain, walking, and

standing, and that he slept in a recliner. (R. at 362). Physical examination revealed some

limitation with forward flexion and lateral bending, and his straight leg raising test was positive

on the left. (R. at 362). Dr. Barke prescribed Norco for pain. (R. 362).

On April 6, 2011, Plaintiff was seen by Raj Sugumaran, M.D., for post-stent follow up.

(R. at 358). Plaintiff reported that since the stent implantation, he noticed a "significant

improvement" in his symptoms. (R. at 360). Plaintiff stated that before the implantation, he

took four to five nitroglycerin pills a week, but had only taken two the past month. (R. at 358).

He further reported that his breathing was "much improved," although he had some limitation

with heavy exertion. (R. at 358). Plaintiff indicated that he had chronic back pain and mild to

moderate peripheral vascular disease, and was unable to walk long distances. (R. at 358). He

denied any chest pain, significant shortness of breath, palpitations, nausea, vomiting,

presyncope/syncope, lower extremity edema, or orthopnea. (R. at 358). Plaintiff's physical

examination was unremarkable. (R. at 358, 360). Dr. Sugumaran reported that Plaintiff's

symptoms had improved significantly post implantation, and continued his cardiac medication

regimen. (R. at 360). With regard to physical activity, Dr. Sugumaran urged him to walk and exercise as much as he could in light of his significant coronary disease. (R. at 360). He was also advised to follow the Mediterranean Diet. (R. at 360). Plaintiff was to return for follow up in six months. (R. at 360).

When seen by Dr. Barke on May 6, 2011, Plaintiff reported that he continued to work full time. (R. at 363). Plaintiff reported that he used his pain medication "very sparingly." (R. at 363). He denied having any chest pain or shortness of breath. (R. at 363). Physical examination of the Plaintiff's back revealed limitation on forward flexion and lateral bending, and his straight leg raising test was positive on the left. (R. at 363).

On August 5, 2011, Plaintiff returned to Dr. Barke and complained of pain at night which caused him to awaken. (R. at 364). He reported that he had difficulty performing work activities and usually went "straight home to the couch." (R. at 364). He further reported difficulties performing daily activities. (R. at 364). Plaintiff denied any shortness of breath, and had only occasional episodes of chest pain. (R. at 364). On physical examination, Dr. Barke found Plaintiff had limitation with forward flexion and a positive straight leg raising test on the left. (R. at 364). He prescribed Norco for Plaintiff's back pain. (R. at 364).

When seen by Dr. Barke on November 4, 2011, Plaintiff reported that he worked full time. (R. at 361). He stated that he still used "quite a bit of nitro," but denied any chest pains or shortness of breath. His physical examination remained unchanged, and he was continued on his medication regimen. (R. at 361).

Plaintiff was evaluated by Timothy Trageser, M.D., a cardiac surgeon, on December 6, 2011. (R. at 367-368). Plaintiff reported that he experienced chest discomfort daily depending upon activity. (R. at 367). He stated that his symptoms were caused by exertional effort, such as

stair climbing. (R. at 367). Despite these symptoms, Plaintiff reported that he was still able to work, performing "very physical work" at a salvage yard. (R. at 366, 368). On physical examination, Dr. Trageser detected bilateral carotid bruits and ordered a carotid sonogram. (R. at 368). He also slightly adjusted Plaintiff's medications. (AR. 368). Plaintiff was assessed with diffuse coronary artery disease with preserved LV function, dyslipidemia, and carotid bruits. (R. at 368).

Plaintiff's carotid sonogram conducted on December 21, 2011 suggested greater than 70% stenosis in the left internal carotid artery, and a 50 to 69% stenosis in the right internal carotid artery. (R. at 373).

On December 27, 2011, Plaintiff underwent a cardiac catheterization with stent placement in the proximal left anterior descending performed by Dr. Trageser. (R. at 375). Dr. Trageser noted that there may have been a chronic dissection proximal to the stent. (R. at 375). He further noted that Plaintiff's circumflex was dominant and occluded in two spots, proximal and distal, and were felt to be too small to bypass at Allegheny General. (R. at 375). The right, nondominant had severe diffuse disease. (R. at 375). Dr. Trageser reported that he would ask a colleague to review the Plaintiff's angiograms in order to determine if any of his distal circumflex branches would be bypassable, and if not, he would attempt to stent the distal circumflex. (R. at 376). He indicated that Plaintiff was already taking "fairly maximal" medications. (R. at 376).

b. Medical evidence submitted to the Appeals Council

On March 14, 2012, Plaintiff was seen by Dr. Trageser, who reported that Plaintiff's rest angina had stopped since his repeat stent, but he still had angina at a moderate workload which curtailed his activities. (R. at 408). Plaintiff reported that he worked in a salvage yard. (R. at

408). On physical examination, Dr. Trageser detected a faint right bruit, and a "little" louder bruit on the left. (R. at 408). His remaining physical examination was unremarkable. (R. at 408-409).

On March 23, 2012, Dr. Trageser performed a cardiac catheterization, stent placement and selective angiography. (R. at 382-383). Dr. Trageser placed a drug-eluting stent in the ramus branch of the circumflex with a good result. (R. at 382). He noted that Plaintiff's carotids were moderate on the right side and moderately severe on the left side, but he was not symptomatic. (R. at 382). He suggested a repeat sonogram in approximately three months. (R. at 382).

Plaintiff was seen by Dr. Barke on April 14, 2012 for a medication refill. (R. at 417). He reported back pain, limited range of motion, muscle aches and muscle weakness. (R. at 419). Plaintiff further reported that he was still working. (R. at 419). On physical examination, Plaintiff had decreased range of motion on flexion, extension, bending and rotation. (R. at 421). Tenderness was noted at the L4, L5 areas, and his straight leg raising test was positive on the left. (R. at 422). Dr. Barke prescribed hydrocodone for Plaintiff's back pain. (R. at 422).

A June 12, 2012 carotid doppler study revealed no stenosis in the right carotid system, and greater than 80% stenosis in the left internal carotid artery. (R. at 403).

Plaintiff returned to Dr. Trageser on June 20, 2012 and reported angina when performing anything more than mild or moderate extertion, but denied experiencing rest angina. (R. at 379). Dr. Trageser noted that Plaintiff's angiograms had been reviewed by multiple surgeons and they all felt that the distal branches were too small to bypass. (R. at 379). Dr. Trageser further noted that Plaintiff also had left carotid stenosis, but had no localizing symptoms. (R. at 379). His

physical examination was unremarkable, except for a faint left bruit. (R. at 379). Dr. Trageser stated Plaintiff was "as good as we're going to get him." (R. at 379).

In a letter to Plaintiff's counsel dated June 20, 2012, Dr. Trageser stated that Plaintiff had severe three-vessel coronary artery disease, with a stented proximal LAD and proximal circumflex. (R. at 381). He further stated that Plaintiff had a dominant circumflex with a large segment of distal disease that was not amendable to surgery or intervention, and had significant limiting angina. (R. at 381). Plaintiff had significant carotid disease and some peripheral disease which also limited him. (R. at 381). He opined that Plaintiff was not able to do "much of a stress test" and "should be considered disabled." (R. at 35).

4. Written submissions

Plaintiff's brother, Walter Miles, submitted a letter dated May 7, 2012 stating that Plaintiff began working for him in 2005 after giving up his contracting job due to the physical demands of the job. (R. at 200). Mr. Miles stated that Plaintiff's abilities had steadily decreased and in early 2010, Plaintiff no longer worked a full day, and that he had given the jobs Plaintiff used to perform to someone else. (R. at 200). Mr. Miles reported that Plaintiff spent about four hours a day at the salvage yard, but could only work a total of one and one half hours with frequent breaks. (R. at 200). Mr. Miles stated that because Plaintiff was his brother, he had done everything he could to accommodate his declining abilities. (R. at 200). He further stated that his business was slow, and "it [was] not something [he] would do or could afford to do for anyone else." (R. at 200).

5. Administrative Hearing

Plaintiff testified at the hearing held by the ALJ that he worked four hours a day at his brother's salvage yard and "virtually [did] nothing to get paid." (R. at 34). He further testified

that his job duties changed daily and he helped two other employees with their job duties. (R. at 35). Plaintiff stated that at times his duties consisted of driving down to the shop and retrieving items, such as a wrench, for other employees. (R. at 35). He further stated that he did not work the entire four hours, and sat around when not working. (R. at 35). Plaintiff testified that he averaged about $30.00 a day in pay the previous year. (R. at 36). At the time of the administrative hearing, Plaintiff testified that he was paid $250.00 a week in salary and that he was responsible for paying his own taxes out of that amount. (R. at 36). Plaintiff indicated he had not worked a full day since 2009. (R. at 37).

Plaintiff testified that he was unable to work due to his cardiac impairment and chronic back pain. (R. at 37-38). Plaintiff stated that he suffered from chest discomfort on a daily basis. (R. at 46). He also suffered from daily back pain. (R. at 38). Plaintiff further testified that he suffered from leg cramps and a shoulder tear. (R. at 37). He was unable to lift his arms above shoulder level. (R. at 48). Plaintiff testified that he took nitroglycerin at least four times per week for his heart condition, and hydrocodone for back pain. (R. at 37-38). Plaintiff further testified that he slept in a recliner three nights per week to prevent rolling over onto his shoulders. (R. at 47). He stated that he spent many hours during the day in his recliner. (R. at 47). Plaintiff testified that he had undergone one injection for his back pain, but it did not completely alleviate his pain, nor did pain medication help. (R. at 39). He claimed his medications caused side effects such as fatigue, muscle aches, nausea and dizziness. (R. at 44).

Plaintiff testified that he was able to care for himself, grocery shop, and drive to work. (R. at 41-42). He claimed he could not walk for more than 100 feet without developing leg cramps and back spasms. (R. at 42). He needed to stand after sitting approximately thirty minutes, and could only stand for thirty minutes before needing to sit, and had a hard time lifting

a gallon of milk.  (R. at 42, 45).  He had trouble climbing stairs, and required breaks while

climbing.  (R. at 46).  Plaintiff testified that he was able to mow the lawn on a riding lawn

mower, but it might take him several days.  (R. at 43).  He was also able to load the dishwasher

on a "good day."  (R. at 47).

**B.**    **ANALYSIS**

    1.  <u>Standard of Review</u>

To be eligible for social security benefits under the Act, a claimant must demonstrate to

the Commissioner that he or she cannot engage in substantial gainful activity because of a

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of at least twelve months.

42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986).  When

reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate

whether a claimant has met the requirements for disability.  20 C.F.R. § 404.1520.

The Commissioner must determine: (1) whether the claimant is currently engaged in

substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a

combination of impairments that is severe; (3) whether the medical evidence of the claimant's

impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt.

404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his

past relevant work; and (5) if the claimant is incapable of performing his past relevant work,

whether he can perform any other work which exists in the national economy.  20 C.F.R. §

404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-5, (2003).  If the claimant is

determined to be unable to resume previous employment, the burden shifts to the Commissioner

(Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work

experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3)[5]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190-91 (3d. Cir. 1986).

## 2. Discussion

The ALJ found that Plaintiff had engaged in substantial gainful activity during the period from his alleged onset date of May 1, 2010, through his date last insured of March 31, 2011. (R. at 18). The ALJ further found that Plaintiff's coronary artery disease with angina that required stenting, and his left L3-4 paracentral disk protrusion causing moderate lateral recessed narrowing and impingement of the descending left-sided nerve roots, were severe impairments, but determined at step three that he did not meet a listing. (R. at 19-21). The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of light work.[6] (R. at 21). At the final step, the ALJ applied Rule 202.10 of the Medical-Vocational guidelines, which direct a finding of not disabled for an individual of Plaintiff's age, education and work experience with the RFC for the full range of light work.[7] (R. at 24). Accordingly, the ALJ

---

[6] "'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(2). In making this determination, the ALJ must consider all the evidence before him. *Burnett*, 220 F.3d at 121.

[7] The Medical-Vocational guidelines, or the "grids," set forth various combinations of age, education, work experience and residual functional capacity and direct a finding of disabled or not disabled for each combination. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. When the four factors in a claimant's case correspond exactly with the four

concluded that Plaintiff was not eligible for DIB under the Act. (R. at 24). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U. S. C. § 405(g).

Plaintiff first argues that the ALJ erred in concluding at step one that his earnings through 2012 constituted substantial gainful activity rather than an unearned subsidy. *See* (ECF No. 8 at pp. 17-18). "Substantial gainful activity" ("SGA") is defined in the regulations as "activity that involves doing significant physical or mental activities," and is "usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572. The Commissioner's regulations provide a mathematical formula for calculating the amount of earnings which constitute SGA. *See* 20 C.F.R. 404.1574(b)(2). If a claimant is paid a certain threshold amount of monthly earnings as calculated by the formula, then the job is presumed to constitute SGA. *See* 20 C.F.R. § 404.1574(a)(1). However, in determining the salary attributable to SGA, the regulations specify that only salary earned through work attributable to the worker's productivity is to be considered. 20 C.F.R. § 404.1574(a)(2). Any salary not attributable to the worker's productivity may be considered a subsidy and is not included in the SGA analysis. *Id*.; *see also* Social Security Ruling ("SSR") 83-33, 1983 WL 31255 at *3. As set forth in SSR 83-33, "[a]n employer may, because of a benevolent attitude toward a handicapped individual, subsidize the employee's earnings by paying more in wages than the reasonable value of the actual services performed. When this occurs, the excess will be regarded as a subsidy rather than earnings." SSR 83-33, 1983 WL 31255 at *3.[8]

---

factors in the grids, the ALJ must reach the result the grids reach. *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) ("Where a claimant's qualifications correspond to the job requirements identified by a rule, the guidelines direct a conclusion that work exists that the claimant can perform."); 20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00.

[8] The Ruling lists seven circumstances that suggest a "strong possibility" of a subsidy:

(1) The employment is "sheltered;" or

The ALJ found that the Plaintiff's testimony that he earned $250.00 per week from his ongoing work activity for his brother's trucking and salvage company was above the SGA level. (R. at 18). The ALJ concluded that the Plaintiff's application for DIB could be denied solely on that basis, but nonetheless proceeded through the remaining steps of the sequential evaluation process because the Plaintiff testified to some variance in his income. (R. at 18). Plaintiff argues that because the ALJ failed to go on to determine whether his income was earned or subsidized, his conclusion at step one was not supported by substantial evidence.

Although the ALJ failed to analyze the subsidy issue in determining whether Plaintiff engaged in SGA, we are of the view that any error in this regard was rendered harmless. As the Commissioner points out, the regulations provide that an ALJ may cease his inquiry and find a claimant not disabled at step one if the claimant is performing substantial gainful activity. *See* (ECF No. 10 at 9) (citing 20 C.F.R. § 404.1520(a)(4)(i)). The ALJ did not deny benefits at step one in this case. Rather, he completed the sequential evaluation process and concluded at step five that Plaintiff could perform other work in the national economy. (R. at 23-24). Accordingly, we find that a remand is not required to reconsider the step one determination since the ultimate outcome would be unaffected. *Accord Salles v. Comm'r of Soc. Sec.*, 229 Fed. Appx., 140, 145 n.2 (3d Cir. 2007) (finding any error in step two analysis was harmless when ALJ continued with sequential analysis) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d

---

(2) Childhood disability is involved; or
(3) Mental impairment is involved; or
(4) There appears to be a marked discrepancy between the amount of pay and the value of the services; or
(5) The employer, employee, or other interested party alleges that the employee does not fully earn his or her pay (e.g., the employee receives unusual help from others in doing the work); or
(6) The nature and severity of the impairment indicate that the employee receives unusual help from others in doing the work; or
(7) The employee is involved in a government-sponsored job training and employment program.

SSR 83-33, 1983 WL 31255 at *4.

Cir. 2005) (holding that where error by ALJ is harmless and would not affect the outcome of the case, remand not warranted).

Plaintiff next argues that the ALJ erred in miscalculating his date last insured in adjudicating his claim. *See* (ECF No. 8 at 19-21). In order to be entitled to DIB, a claimant must establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). The administrative record contains two different dates for the Plaintiff's date last insured. In the Development Summary Worksheet, an entry dated October 8, 2010, states "[t]he correct date last insured is 03/31/2011." (R. at 316). Another portion of the administrative record dated January 5, 2012, contains the abbreviation "DIS DLI: 12/11." (R. at 135). The ALJ determined that the Plaintiff's date last insured was March 31, 2011 (R. at 16). This finding is supported by substantial evidence, and therefore, there is no need for remand on this issue.

Plaintiff next argues that the ALJ erred in failing to consider his bilateral shoulder impairment. *See* (ECF No. 8 at 21-22). We disagree. The medical evidence reflects that the Plaintiff was seen prior to his alleged onset date for complaints of bilateral shoulder pain in January 2010. (R. at 266). Right shoulder surgery was recommended, but on March 5, 2010, Plaintiff was not cleared for surgery due to his cardiac impairment. (R. at 230, 265). Thereafter, the record is devoid of any treatment for his alleged shoulder impairment during the relevant time period. *See e.g., Lane v. Comm'r of Soc. Sec.*, 100 Fed. Appx. 90, 95 (3d Cir. 2004) (holding that the lack of medical evidence was "very strong evidence" that the claimant was not disabled).

Moreover, as the ALJ observed, Plaintiff did not allege disability on the basis of a shoulder impairment when filing his application, nor did he complain of any shoulder

impairment when examined by Dr. Singh, the consultative examiner, in December 2010. (R. at 22). The ALJ further observed that Plaintiff's counsel did not mention any shoulder impairment in his January 27, 2012 written submission. (R. at 22). Indeed, Plaintiff's counsel represented that "Claimant alleges impairments of the lumbar spine and the cardiovascular system." (R. at 82). Finally, aside from the Plaintiff's testimony (which the ALJ found only partially credible), the record contains no functional limitations resulting from the Plaintiff's alleged shoulder impairment during the relevant time period. In sum, we find no error in the ALJ's evaluation of the Plaintiff's shoulder impairment.

Plaintiff's final challenge is to the ALJ's step three analysis. Plaintiff argues that his coronary artery disease met Listing 4.04B (ischemic heart disease). *See* (ECF No. 8 at 23-24). In order to meet Listing 4.04B, a claimant must demonstrate three separate ischemic episodes, each requiring revascularization, or not amendable to revascularization (*see* § 4.00E9f), within a consecutive 12-month period (*see* § 4.00A3e). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.04B.[9] Plaintiff argues that he underwent cardiac catheterization and revascularization on July 7, 2010 (R. at 221-222), March 3, 2011 (R. at 362), December 27, 2011 (R. at 375-376), and March 23, 2012 (411). On June 20, 2012, Dr. Trageser opined that Plaintiff's cardiac disease was not amendable to revascularization. (R. at 379). Plaintiff contends that his revascularizations on December 27, 2011 and March 23, 2011, as well as Dr. Trageser's opinion dated June 20, 2012, satisfy the requirements of Listing 4.04B. The Commissioner counters that Plaintiff cannot rely on evidence not considered by the ALJ in arguing that he meets the Listing, relying on *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). *See* (ECF No. 10 at p. 15-18). We agree with the Commissioner, and conclude that *Matthews* precludes us from reviewing the March 23, 2012

---

[9] Revascularization means "angioplasty (with or without stent placement) or bypass surgery." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00E9f.

report, as well as Dr. Trageser's opinion dated June 20, 2012, in evaluating the ALJ's decision under the substantial evidence standard.

When a claimant seeks to rely on evidence that was not before the ALJ, the district court may remand the case to the Commissioner if three requirements are met. *See Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001). First, the evidence must be "new," in the sense that it is not cumulative of pre-existing evidence on the record. *Matthews*, 239 F.3d at 593-94; *Szubak v. Sec. of Health and Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984). Second, new evidence must also be "material," in that it is relevant to the time period and impairments under consideration, it is probative, and it is reasonably possible that such evidence would have changed the ALJ's decision if presented earlier. *Id.* Finally, "good cause" must be shown for not submitting the evidence at an earlier time. *Matthews*, 239 F.3d at 593. The court demands these three showings be made to avoid inviting claimants to withhold evidence in order to obtain another "bite of the apple" when the Commissioner denies benefits. *Matthews,* 239 F.3d at 595 (citing *Szubak*, 745 F.2d at 834).

Here, Plaintiff has not specifically requested a remand for the purpose of the ALJ considering these two reports. Even if we assume Plaintiff has implicitly done so by relying on this evidence before this Court, he has not met his burden under *Matthews*. As pointed out by the Commissioner, with respect to the March 23, 2012 report, this evidence is not "new," in that it was in existence prior to the ALJ's June 11, 2012 decision. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990) (evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding"). In addition, this report is immaterial since it does not relate to the time period under consideration. *See e.g. Wilson v. Halter*, 2001 WL 410542 (E.D.Pa. 2001) (medical reports relating to a period of time

after that addressed in the hearing are immaterial to the ALJ's decision and therefore do not warrant remand), *aff'd*, 27 Fed. Appx. 136 (3d Cir. 2002). Even if we considered the report relevant, Plaintiff has failed to demonstrate good cause for not presenting this evidence to the ALJ for consideration. He did not request any additional time in which to submit medical evidence, nor has he claimed difficulty in obtaining his own records. *See e.g. Smith v. Comm'r of Soc. Sec.*, 80 Fed. Appx. 268, 270-71 (3d Cir. 2003) (claimant failed to demonstrate good cause where no explanation provided for failing to obtain evidence in time for ALJ to consider it); *Oshetsky v. Colvin*, 2013 WL 4810196 at *4 (W.D.Pa. 2013) (holding good cause not shown where there was no indication that claimant attempted to provide records to ALJ or sought any extension of time initially given him by ALJ).

With respect to Dr. Trageser's report dated June 20, 2012, while this report is "new" in the sense that it was generated after the ALJ's decision dated June 11, 2012, it is immaterial since it does not relate to the time period for which benefits were denied. *See e.g. Rainey v. Astrue,* 2012 WL 3779167 at *8 (W.D.Pa. 2011) (holding new evidence remand not warranted since report not "material" in that it was not an assessment of the claimant's condition during the relevant time period); *Harkins v. Astrue*, 2011 WL 778403 at *1 n.1 (W.D.Pa. 2011) (holding that a new evidence remand was not warranted where records dated one month after ALJ's decision did not expressly relate back to relevant period). We conclude that Plaintiff has failed to demonstrate a new evidence remand is required with respect to either of these reports.

Plaintiff next argues that his back impairment satisfies 1.04A of the Listings. *See* (ECF No. 8 at 24-25). In order to meet Listing 1.04A, a claimant must have a disorder of the spine resulting in compromise of the nerve root, with evidence of nerve root compression, characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor

loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (sitting and supine). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.04A.

In support of his contention that his back impairment met the Listing, Plaintiff relies on his MRI study which showed a large left L3-4 paracentral disk protrusion with impingement of the left-sided nerve roots. (R. at 318). Plaintiff also contends that the record contains evidence of decreased lumbar range of motion (R. at 362, 419, 421), neuro-anatomic distribution of pain (R. at 317, 343), reflex loss (R. at 422), weakness (R. at 422), and multiple instances of positive straight leg raising tests on examination (R. at 362, 364, 422, 424). *See* (ECF No. 24-25).[10] However, "[f]or a claimant to show that an impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (emphasis in original); *see also Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

Here, the evidence does not support a finding that Plaintiff met all the requirements of 1.04A because the record is devoid of any evidence demonstrating motor loss accompanied by sensory or reflex loss, and a positive straight leg raising test, both sitting and supine, during the relevant time frame. When examined by Dr. Barke on November 22, 2010, Plaintiff had marked limitation on forward flexion and lateral bending, and his straight leg raising test was positive on the left. (R. at 343). By December 6, 2010, however, Plaintiff reported to Dr. Barke that his back pain had completely resolved and he wanted to resume physical activity since he was "pain

_____

[10] Plaintiff cites to treatment records from Dr. Barke dated February 12, 2012 (R. at 424) and April 14, 2012 (R. at 419, 421-422) in further support that he met Listing 1.04A. However, as discussed in connection with Plaintiff's cardiac impairment, pursuant to *Mathews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001), we cannot consider this evidence in our review of the ALJ's decision.

free." (R. at 342). When examined by Dr. Singh, the consultative examiner, on December 13, 2010, Plaintiff did not report any musculoskeletal problems, and his physical examination was normal. (R. at 311). Plaintiff's motor power was 5/5 in his lower extremities, his sensory was 5/5 in his lower extremities, his gait was steady, he had no balance problems, and no neurological deficits were noted. (R. at 311). Dr. Singh noted that Plaintiff had a history of some disc disorder only "off and on," and imposed no work related restrictions. (R. at 311). On March 10, 2011, Plaintiff reported increased difficulty with back pain, and his physical examination revealed some limitation with forward flexion and he had a positive straight leg raising test on the left, but he denied any numbness or weakness. (R. at 362). On May 11, 2011 Plaintiff again denied any numbness or weakness, and reported that he used his pain medication "very sparingly." (R. at 363). On November 4, 2011, Plaintiff denied any symptoms of numbness or weakness, and reported that he continued to work full time. (R. at 361). In point of fact, Plaintiff consistently reported that he continued to work full time throughout the relevant time period. (R. at 310, 361, 363, 366).

In sum, because the Plaintiff failed to demonstrate that his back impairment met or equaled all of the specified criteria of Listing 1.04A, we find that the ALJ's step three determination is supported by substantial evidence. *See Garrett v. Comm'r of Soc. Sec.*, 274 Fed. Appx. 159, 162-63 (3d Cir. 2008); *Johnson v. Comm'r of Soc. Sec.*, 263 Fed. Appx. 199, 202-03 (3d Cir. 2008).[11]

## C.    CONCLUSION

---

[11] To the extent Plaintiff complains that the ALJ only discussed Listing 4.04C in his step three analysis, the ALJ explained that he focused on that particular Listing since it was only Listing Plaintiff argued that he met. (R. at 21). Indeed, the administrative record reflects that Plaintiff's counsel argued that Plaintiff met Listing 4.04C. (R. at 83). Plaintiff's counsel also conceded, as the ALJ acknowledged, that Plaintiff could meet the demands of sedentary work, albeit with a sit/stand option. (R.at 84).

Based upon the foregoing, we conclude that the ALJ's findings were supported by substantial evidence and he complied with applicable law. Accordingly, it is respectfully recommended that Plaintiff's Motion for Summary Judgment (ECF No. 7) be denied, Defendant's Motion for Summary Judgment (ECF No. 9) be granted, and the decision of the ALJ be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.D.2 of the Local Rules of Court, the parties are allowed fourteen (14) days from the date of service of a copy of this Report and Recommendation to file objections. Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto. Failure to file timely objections will constitute a waiver of any appellate rights.

November 26, 2013

_s/ Susan Paradise Baxter_
Susan Paradise Baxter
United States Magistrate Judge

cc/ecf: All counsel of record.